VIRGILIO AYALA RIVERA, demandante y apelante, *v.* MARYLAND CASUALTY COMPANY y PETER B. PULMAN, demandados y apelados.

No. 6324.—*Sometido:* Junio 8, 1934. *Resuelto:* Julio 26, 1934.

* NOTA: Véase el prefacio.

*Isaías M. Crespo,* abogado del apelante; *Juan B. Soto,* abogado de los apelados.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

Virgilio Ayala Rivera, demandante y apelante en este caso, estableció demanda en la Corte de Distrito de San Juan contra Maryland Casualty Co. y Peter B. Pulman, alegando que es practicante y que como tal estaba empleado por la Central Bocachica; que la demandada Maryland Casualty Co. era la aseguradora de los obreros de dicha central y que valiéndose de esa posición y por medio del otro demandado, Peter B. Pulman, recomendó y exigió de la Central Boca-

chica la destitución o cesantía del demandante, aduciendo para ello que dicho demandante había suturado mal los tendones de una mano al lesionado Antonio Mercado, quien quedó incapacitado parcial y permanentemente de la referida mano; que el demandante se había dedicado a tratar ciertos casos y una vez infectados, los enviaba a Ponce para ser tratados por el médico; que por causa del demandante se había gastado suero antitetánico excesivamente y había habido que pagar una indemnización de $743.43 por la incapacidad parcial del obrero antes aludido.

Alega el demandante, además, que dichas manifestaciones son falsas y fueron la causa de su cesantía en dicho empleo, y que por razón de esa cesantía y en virtud de la actitud de los demandados, ha sufrido daños y perjuicios que estima en la suma de $14,630, que reclama, con las costas.

Declarada sin lugar la demanda y establecido recurso de apelación contra la sentencia dictada, pasaremos a resolver especialmente los tres primeros errores atribuídos a la corte inferior, porque son los únicos que el demandante se sirve discutir extensamente en su interesante alegato, y porque los demás carecen de importancia y es innecesario prestarles una detenida consideración. Se alega en primer término que la corte inferior erró al declarar válido el juramento a la contestación.

Dispone el artículo 118 del Código de Enjuiciamiento Civil que el juramento de las alegaciones se hará por declaración suscrita y jurada de la parte, a menos que se hallare ausente del distrito en que residiere su abogado, o por cualquiera otra causa estuviere imposibilitada de verificarlo, o cuando los hechos sean conocidos de su abogado u otra persona que los jurare. Cuando la alegación sea jurada por el abogado o cualquiera otra persona y no por las partes, deberá consignarse en la declaración suscrita y jurada la razón por la cual no lo hace una de las partes.

En este caso es el abogado quien presta el juramento, haciendo constar que lo hace por encontrarse los demandados

ausentes del distrito donde reside el referido abogado. No aparece de los autos que el demandante interpusiera objeción alguna al juramento ni antes ni después de celebrado el juicio por la corte inferior. La prueba aportada no autoriza la conclusión de que el juramento no haya sido prestado de acuerdo con las disposiciones de la ley; pero aunque fuera defectuoso, el demandante estaría impedido de plantear esta cuestión en apelación. En el caso de *Rivera* v. *Central Pasto Viejo*, 43 D.P.R. 714, dijo esta corte: ''Es innecesario proceder a discutir los defectos de que adolece el juramento y las admisiones contenidas en la contestación. Reconocemos que se trata de una contestación defectuosa y de un juramento también defectuoso. Pero el demandante no solicitó sentencia sobre las alegaciones y está impedido para plantear esta cuestión en apelación.''

De la obra ''California Jurisprudence'', tomo 21, página 221, extractamos lo que sigue:

''Las objeciones a la falta de juramento de una demanda deben interponerse antes de la contestación o cuando la misma se radica, y si el demandado contesta o las partes proceden a juicio sin objeción, el defecto se considera renunciado y no puede ser suscitado en apelación. Igual ocurre con la falta de juramento en la contestación del demandado, que se considera renunciada si las partes celebran el juicio sin una objeción previa de parte del demandante. Tal objeción no puede ser levantada después que se inicia el pleito en los méritos ni puede por primera vez ser suscitada en apelación, luego de haberse celebrado juicio.''

El error apuntado debe ser desestimado.

■■■ Se alega en segundo término que la corte inferior erró fundamentalmente al apreciar la prueba. A juicio del apelante quedó satisfactoriamente probado que Pulman es un funcionario de la demandada, Maryland Casualty Co., y que instruyó, ordenó y exigió a la Central Bocachica que separara de empleo y sueldo al referido apelante, actuando maliciosamente y sólo por sospechas infundadas de que el referido apelante había lesionado los intereses de la Maryland

Casualty Co. Estas sospechas infundadas, según el demandante, fueron originadas por el Dr. Gelpí, actuando como un empleado y con el interés de defender los supuestos derechos de la demandada Maryland Casualty Co.

Una de las cuestiones debatidas en este caso es la que se relaciona con el nombramiento de cirujano menor para la Central Bocachica. De acuerdo con la ley los dueños de centrales deben sostener durante la zafra un botiquín y un médico o cirujano menor que permanecerá en la Central durante las horas de trabajo para acudir con urgencia a los accidentes desgraciados que ocurriesen. Los demandados alegan que el nombramiento de este practicante para la referida central lo hace la Maryland Casualty Co.; el demandante parece sostener que es la Central Bocachica la que designa al practicante. La Maryland Casualty Co. es la aseguradora de los obreros de dicha factoría a los efectos de garantizar el pago de indemnizaciones por accidentes del trabajo.

De la prueba aportada se deduce que el practicante o cirujano menor disfrutaba de un sueldo de $90 mensuales, $50 de los cuales satisfacía la Maryland Casualty Co. y $40 la central. El auditor de la factoría, Sr. Luis Betancourt, declara que la Maryland Casualty Co. es quien hace el nombramiento y da instrucciones con respecto a lo que la persona nombrada tiene que hacer. El practicante, según el testigo, es un empleado de la Maryland Casualty Co. El Dr. Pulman, encargado de la dirección y administración del departamento médico de la Maryland Casualty Co. en Puerto Rico, declara que fué la American Casualty Có. quien hizo el nombramiento del demandante, Virgilio Ayala, sobre la base de un servicio satisfactorio. Afirma el testigo que la compañía aseguradora es la que tiene a su cargo el nombramiento del practicante.

La prueba demuestra que la Central Bocachica ha prestado su consentimiento para que la Maryland Casualty Co. designe el practicante que ha de tratar a los trabajadores asegurados por dicha corporación que sufran lesiones durante

las horas de trabajo. La demandada satisface a este empleado más de la mitad del salario mensual de que disfruta. Si la Maryland Casualty Co. es quien designa al referido empleado, nadie puede discutirle su derecho a prescindir de sus servicios al vencerse el término por el cual fueron arrendados tales servicios. Si como parece deducirse de la prueba, se trata de un nombramiento por meses, la demandada no ha violado ningún contrato ni incurrido en responsabilidad al notificar al demandante oportunamente la fecha en que había de cesar en su empleo. Se alega, sin embargo, que en virtud de las manifestaciones hechas a la Central Bocachica por la demandada a través de sus empleados, el demandante no solamente se ha visto privado de la colocación que desempeñaba, sino que también ha sufrido daños y perjuicios, porque su reputación ha quedado lesionada con motivo de las acusaciones de que ha sido objeto.

El auditor de la factoría, Sr. Betancourt, declara que el Sr. Braegger, representante en Puerto Rico de la Maryland Casualty Co., y el Dr. Pulman se personaron en su oficina y le dieron instrucciones verbales para retirar de sus servicios al practicante. Estos señores le dijeron: "Nosotros venimos a tratar el asunto del practicante. No estamos contentos con sus servicios y no queremos seguirlo utilizando." El auditor les contestó que era una medida muy drástica proceder inmediatamente; que debía notificarse al empleado, por lo menos con un mes de anticipación, de acuerdo con la ley, diciéndole entonces el Dr. Pulman: "Bueno, para tener efecto el día último del mes siguiente." El Sr. Betancourt manifestó, que estando ausente su principal, exigía que se le expresase un motivo para tomar esta medida, "puesto que nosotros (significando la Central) no teníamos ninguno." El Dr. Pulman habló de ciertos casos mal tratados que le habían costado a la compañía algún dinero, especialmente uno que le costó alrededor de $800, cuyo nombre no recordaban ni el testigo ni el Dr. Pulman. Prometió éste escribir al Sr.

Betancourt, lo que hizo al día siguiente, dirigiéndole una carta que dice así:

"29 de julio de 1931.

"Sr. L. Betancourt, Auditor,
    Central Bocachica, Ponce, P. R.

"Estimado Sr. Betancourt:

"He informado al Dr. Gelpí que Ud. hablaría con él próximamente en relación con el asunto del practicante.

"El nombre del obrero a que hice referencia ayer es Antonio Mercado, accidente: 'Herida de la muñeca grave, lacerada, 24 de febrero de 1931.' Reclamación terminada en julio, con pérdida del 90% del movimiento de la mano. El costo de la compensación solamente asciende a más de $800.

Atentamente,

(Fdo.)   Peter B. Pulman."

Manifiesta el Sr. Betancourt que comunicó a su principal, o sea al administrador de la Central, las instrucciones verbales que había recibido del Sr. Braegger y del Dr. Pulman, y que por orden del administrador trasmitió verbalmente al Sr. Ayala las instrucciones recibidas.

Es claro que la Maryland Casualty Co., aseguradora de los obreros lesionados por accidentes del trabajo, tiene que estar interesada en asegurar una inmediata y eficiente asistencia a los obreros lesionados y en la selección de un buen personal para proteger sus intereses. En este respecto el interés de la demandada es muy superior al de la Central Bocachica, la cual desde el punto de vista de la responsabilidad material no tiene que preocuparse acerca del tratamiento a que se someta al paciente. No puede discutírsele a la demandada el derecho de encomendar este trabajo a una persona que merezca su confianza. En estas condiciones las palabras de los representantes de la compañía aseguradora, manifestando que no querían seguir utilizando los servicios del demandante, y su respuesta al requerimiento del Sr. Betancourt para que expresasen los motivos que les inducían a tomar tal actitud, constituyen una comunicación privilegiada

que no puede dar origen a una causa de acción en favor del empleado cuyos servicios no se quieren utilizar. Se arguye que el obrero Antonio Mercado no fué asistido por el demandante y que la corporación demandada tomó como base una información errónea para privarle del cargo que desempeñaba. Aparte de que no se ha demostrado que la Maryland Casualty Company actuara de mala fe, las palabras vertidas por los Sres. Braegger y Pulman a requerimiento de la Central Bocachica no pueden tener el alcance que les atribuye la parte demandante. Esas palabras fueron pronunciadas en una conversación de carácter íntimo por representantes de la compañía aseguradora interesados en que el tratamiento médico que reciben los pacientes se preste a su satisfacción.

En el caso de *Melcher* v. *Beeler,* 110 Pac. 181, dice la Corte Suprema de Colorado:

"Según dijimos sustancialmente en el último caso citado, una comunicación hecha *bona fide* sobre cualquier asunto en que la parte que hace la comunicación tenga interés, o con referencia a la cual tenga un deber, es privilegiada, si es hecha a una persona que tiene un interés o deber correspondiente, aunque contenga materia incriminatoria que, sin tal privilegio, sería calumniosa y procesable; y esto es así aunque el deber no sea legal, sino solamente moral o social de imperfecta aplicación. Mas la persona a quien se dirige tal pregunta no puede abusar de su privilegio al contestarla. Si a sabiendas hace cualquier imputación falsa contra la persona respecto a quien se le pregunta, no puede alegar inmunidad, toda vez que en respuesta a una pregunta no está en el deber de decir una mentira. Odgers sobre Libelo y Calumnia, pág. 198. Si el testimonio relativo a la cuestión de si una comunicación es o no privilegiada está en conflicto, la cuestión relativa a su naturaleza a este respecto sería una de derecho a resolver por la corte. Por otra parte, de surgir cualquier controversia sobre si la misma es o no privilegiada, tal controversia sería una de hecho a determinar por el jurado de conformidad con las instrucciones apropiadas. 18 Ency. 1050; Townsend sobre Libelo y Calumnia, párrafos 287, 288. Mas, aunque una comunicación sea privilegiada, la cuestión de buena fe, creencia en la veracidad de las aseveraciones hechas, y la existencia de malicia real, es una que debe ser resuelta por el jurado cuando, de acuerdo con

las cuestiones y testimonio prestados, la misma está en controversia, y al demandante incumbe establecer los hechos que hacen procesable una comunicación privilegiada. (Denver P. W. Co. v. Holloway, 34 Colo. 432, 83 Pac. 131, 3 L.R.A. (N. S.) 696, 114 Am. St. Rep. 171); pero la falsedad de las aseveraciones contenidas en una comunicación privilegiada no es de por sí suficiente para suscitar la inferencia de que las mismas fueron hechas maliciosamente. Fowles v. Bowen, 30 N. Y. 20; Ritchie v. Arnold, 79 Ill. App. 406.''

Véase también 17 R.C.L. 357 y 359, y 36 C. J. 1246.

En el presente caso el interés de la parte que suministró la información es manifiesto. Esta información fué comunicada a una parte que la solicitó y que tiene también cierto interés en el asunto. No estaba obligada la compañía aseguradora a seguir utilizando los servicios del demandante como cirujano menor si no era éste su deseo. Cuando la demandada hizo saber su decisión a un empleado de la factoría, se le requirió para que expresase los motivos que la inducían a no seguir utilizando los servicios del demandante. Fué entonces que la demandada, por conducto de sus representantes, respondió, explicando sus razones, al requerimiento de la Central. El Dr. Pulman tuvo noticias por el Dr. Gelpí, médico también de la compañía, de que Antonio Mercado había sido asistido por el demandante. El Dr. Gelpí declara que obtuvo esta información del propio paciente Antonio Mercado, quien niega haber hecho las manifestaciones que se le atribuyen. Declaran también varios testigos del demandante que Antonio Mercado no fué asistido por Virgilio Ayala. No hay base, sin embargo, para sostener que el Dr. Pulman actuara de mala fe. No surge de la prueba que produjera la información, solicitada por la Central Bocachica, movido por malicia o por cualquier otro motivo tendente a perjudicar en su reputación al demandante. Sí se advierte el deseo de asegurar un buen servicio y proteger los intereses de la compañía aseguradora.

El demandante ofreció también como prueba una carta que le fué enviada por el Sr. Pulman, representante de la

demandada, en contestación a otra que le escribiera el propio Virgilio Ayala. La referida carta dice así:

"Agosto 24, 1931.

"Sr. Virgilio Ayala Rivera, Practicante,
   Central Boca Chica, Ponce, P. R.

Estimado señor:

"Acuso recibo de su carta de agosto 7 de cuyo contenido he tomado buena nota. He demorado contestar a la misma, debido a que deseaba darle al Dr. Gelpí el beneficio de conocer los informes dados por Ud. respecto a Antonio Mercado, y no me fué posible obtener el informe de él hasta ahora.

"En mi mente no había duda alguna de que era necesario efectuar un cambio en Bocachica, pues nada había que resaltara más que el hecho de que estábamos usando una cantidad excesiva de drogas, especialmente sueros, para el tratamiento de los lesionados en la Central. El costo de éstos había sido pasado por alto por mí hasta fines del año fiscal; y después de hacer una revisión de los mismos, no he podido dejar de llegar a la conclusión de que ha habido mala administración en la aplicación de las drogas en la Central. El costo del suero antitetánico solamente en la Central Bocachica para los lesionados que se hallaban bajo tratamiento en la Central, era tres veces mayor que el costo de los sueros usados en la Central Coloso, donde fueron atendidos muchos más lesionados.

"Lamento no estar en condiciones de modificar mi decisión, toda vez que lo hago por economía y en beneficio del servicio.

Atentamente suyo,

(Fdo.) Peter B. Pulman."

Hemos leído cuidadosamente la carta que antecede, y no creemos que el contenido de la misma haga surgir una causa de acción en favor del demandante. La referida carta fué escrita en contestación a una que escribiera al Dr. Pulman el propio demandante Sr. Virgilio Ayala. En el citado caso de *Melcher* v. *Beeler*, dice la Corte Suprema de Colorado:

"Manifestaciones difamatorias provocadas o procuradas por un demandante o una persona actuando a su nombre, no apoyarán una acción por libelo. En tales circunstancias la parte que alega que ha sido injuriada por una carta contestación a una súplica relacionada

con él, ha provocado la comisión de un agravio y no será oída para decir que ha sido injuriada.''

El tercer motivo de error se basa en que el juez de la corte inferior, Hon. Carlos Llauger, es padre de la esposa de don Sabino Valdés, quien a su vez es el *claim manager* en Puerto Rico de la demandada Maryland Casualty Co. y jefe inmediato del codemandado Dr. Peter B. Pulman. Entiende el demandante que el Hon. Juez Llauger ha debido inhibirse de acuerdo con el artículo 23 del Código de Enjuiciamiento Civil, que dispone que un juez deberá inhibirse de actuar en todo pleito o procedimiento judicial en que tuviere parentesco de consanguinidad o afinidad con cualquiera de las partes dentro del cuarto grado, o con el abogado de cualquiera de las partes dentro del segundo grado. La demandada alega que la representación que ostenta el Sr. Valdés no establece relación alguna de consanguinidad o afinidad entre ella y el juez, y que por lo tanto éste no estaba obligado a inhibirse. Es posible que la inhibición del juez, en ciertas circunstancias, cuando sus relaciones con el representante de una entidad que es parte en un litigio equivalga a las que determina el Código de Enjuiciamiento Civil como causa de inhibición, resulte un paso acertado; pero como no puede haber parentesco de consanguinidad o afinidad con una persona jurídica, estrictamente hablando, dentro de las disposiciones de la ley, no puede decirse que el juez esté obligado a inhibirse. Hay que tener en cuenta, además, que el demandante en ningún momento solicitó la inhibición del Juez Llauger y que esta cuestión se suscita por primera vez en este recurso de apelación. Es verdad que el demandante alega que desconocía las relaciones existentes entre el Sr. Valdés y el Juez, y si eso es así, es claro que no pudo suscitar la cuestión oportunamente; pero no puede negarse que si se permitiera que una objeción de esta naturaleza pudiese interponerse por primera vez en apelación, la parte que así actuara quedaría colocada en una posición muy ventajosa, porque podría aprovecharse

del fallo en caso de serle favorable y establecer su objeción en caso de serle adverso. Opinamos, sin embargo, que de acuerdo con las disposiciones del Código de Enjuiciamiento Civil el Juez no estaba obligado a inhibirse en el presente caso.

Los errores cuarto, quinto, sexto y séptimo se refieren a eliminaciones de cierta parte del testimonio de los testigos Euclides Schmidt y Virgilio Ayala, que carecen de importancia y deben ser desestimados.

Los errores octavo y noveno se basan en haber impedido la corte que los testigos Gelpí y Pulman contestaran cierta pregunta. Estos errores carecen también de importancia y deben ser desestimados.

El décimo error no merece ser tenido en consideración: se alega que la corte erró al considerar con seriedad la declaración del Dr. Gelpí.

*Debe confirmarse la sentencia apelada.*