EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* HIPÓLITO CUEVAS COLLAZO, acusado y apelante.

Núm. 7327.—*Sometido:* Febrero 1, 1939. *Resuelto:* Febrero 15, 1939.

---

* NOTA: Véase el prefacio.

302

 

*Carlos D. Vázquez* y *Virgilio Brunet,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Hipólito Cuevas Collazo fué procesado por una alegada infracción de la sección 1ª de la Ley núm. 26 de abril 26, 1934 (Leyes de 1934, pág. 279). Los hechos probados y aceptados por el fiscal y por la defensa son como sigue:

Desde el mes de enero, 1936, el acusado, comerciante de provisiones al detall y dueño de un colmado en Santurce, estableció y sostuvo relaciones comerciales con la casa "Nestle's Milk Products, Inc.," la cual le abrió un crédito de $150. En julio 7 de 1937 la cuenta del acusado arrojaba un balance de $101.55 a favor de la Compañía Nestle. En julio 10 de 1937 el acusado entregó al vendedor de dicha compañía un cheque por $43.25 para abonar a su cuenta de entrega de mercancías. Al entregarle el cheque a dicho vendedor el acusado le manifestó que no tenía fondos suficientes en el banco para hacerlo efectivo, que le esperara unos días en lo que él reunía fondos. El cheque fué presentado dos veces al banco y rechazado por falta de fondos. Después de ser notificado de que el cheque no había sido pagado, el acusado hizo varios pagos en dinero efectivo, para abonar a su cuenta corriente, los cuales pagos fueron aceptados por la compañía acreedora.

Al declarar en su propia defensa dijo el acusado: "Yo le dije que le daba ese cheque pero que yo esperaba recolectar dinero suficiente porque me pagaban semanal; que presentara dentro de dos o tres días el cheque para tener

tiempo de colocar fondos suficientes en el banco''; que no recibió nada, ni mercancías ni dinero a cambio del cheque; que cuando el Sr. García vino a verle con el cheque él le abonó $15, y le informó ''que no había recibido el dinero que esperaba y sin embargo del dinero anterior tenía $15 que iba a dárselos''; que García aceptó el dinero y no le dió recibo ni le devolvió el cheque; que más tarde volvió el cobrador de la Nestle y él le entregó $5 en julio, $6.30 en agosto 9, y $2.10 en agosto 16 para abonar a su cuenta; que después del 16 de agosto no pudo seguir haciendo abonos porque fué embargado por otro acreedor; que cuando García se llevó el cheque sabía que en ese momento no podía presentarlo porque no había fondos. La declaración del acusado está plenamente corroborada por las de los testigos de la acusación. No existe, pues, controversia en cuanto a los hechos.

Declarado culpable y condenado a pagar una multa de $87 o a la prisión subsidiaria, el acusado apeló. En su alegato sostiene que la corte inferior erró al apreciar la evidencia, pues de ella no resulta que el acusado cometiera delito público alguno.

La sección 1ª de la Ley núm. 26 de abril 26, 1934, de cuya violación se acusa al apelante, lee como sigue:

''Sección 1.—Cualquier persona que, *con el propósito de defraudar a otra,* haga, extienda, endose o entregue un cheque, giro, letra u orden para el pago de dinero, a cargo de cualquier banco, u otro depositario, sabiendo al hacerlo, que el emisor o girador no tiene suficientes fondos o créditos establecidos en dicho banco o depositario para el pago total del cheque, giro, letra u orden, a la presentación del mismo, será culpable de delito menos grave, y convicta que fuere, será castigada con multa que no será menor del doble del importe de dicho cheque, giro, letra u orden, o a sufrir un día de cárcel, por cada dólar o fracción que deje de satisfacer, o ambas penas a discreción del tribunal.''

Como se ve por las palabras en letra bastardilla, el estatuto de esta jurisdicción consigna como requisito o elemento

esencial del delito el de que la expedición, endoso o entrega del cheque haya sido hecha con el propósito de defraudar a otra persona. Así lo entendió el denunciante cuando hizo constar expresamente en su denuncia que el cheque había sido expedido "con el propósito de defraudar a Nestle's Milk Products, Inc." Sin esa alegación del propósito específico de defraudar, la acusación hubiera sido insuficiente y la corte inferior se hubiese visto obligada a declarar con lugar la excepción perentoria que contra ella se formulara.

¿Sostiene la prueba practicada la alegación del propósito de defraudar que tuviera el acusado al expedir el cheque en cuestión? La contestación debe ser negativa, porque no vemos cómo podría sostenerse con éxito que tal propósito existiera cuando la prueba demuestra que en el momento de hacer entrega del cheque el librador advirtió a su acreedor que él no tenía fondos suficientes para que el cheque pudiese ser pagado a su presentación y le rogó que esperase hasta que él pudiese depositar los fondos necesarios.

Arguye el fiscal que en el caso de autos el propósito o intento de defraudar quedó probado por el hecho de que el acusado, no obstante haber sido notificado de que el pago había sido rehusado, no recogió el cheque dentro del término que marca la ley. Y cita en apoyo de su argumentación las secciones 2, 4 y 5 de la citada Ley núm. 26 de 1934, que leen como sigue:

"Sección 2.—Hacer, extender, endosar o entregar un cheque, giro, u orden, cuyo pago sea rehusado por el girado, por insuficiencia de fondos, o falta de crédito, constituirá evidencia prima facie del conocimiento que tenía el girador o endosador de la insuficiencia de los fondos o falta de crédito.

". . . . . . . . . .

"Sección 4.—Ninguna persona será castigada de acuerdo con esta Ley, a menos que se pruebe, a satisfafacción de la corte, que el tenedor del cheque, giro, letra u orden, o su agente, ha avisado personalmente al girador y al endosador para que pague al tenedor o a su agente, en la dirección que se indicará en el aviso, el importe del cheque, giro, letra u orden, dentro de un plazo no menor de diez (10),

días, si el girador o endosador, a quien se dirige el aviso, residiere en la localidad del tenedor y no menor de quince (15) días, si residiere en otro municipio de la isla. Dicho término se computará desde la fecha del aviso al girador o endosante, del giro, cheque, letra u orden no pagada.

"Sección 5.—La falta de pago, después de dicho aviso, por parte del que ha girado, firmado, endosado o entregado dicho cheque, giro, letra u orden, se considerará prima facie como propósito de defraudar."

No estamos conformes con la interpretación que da el fiscal a los preceptos legales que acabamos de transcribir. El propósito claro y evidente de la sección 4, supra, es proveer un procedimiento para comprobar *a posteriori* o sea por hechos subsiguientes cuál era la intención o propósito que tuviera en su mente el librador de un cheque sin fondos en el momento de expedirlo y entregarlo a otra persona. Siendo la intención o propósito con que se realiza un acto, una función subjetiva y como tal imposible de ser probada objetivamente, el legislador se vió en la necesidad de dictar reglas de evidencia por virtud de las cuales el juzgador puede deducir conclusiones o establecer presunciones en contra del acusado, basándolas en la conducta o manifestaciones de éste tanto en el momento de expedir el cheque como después de haber sido notificado de su rechazamiento. Así, de acuerdo con la sección 2, supra, cuando se hace y entrega un cheque y el girado rehusa pagarlo por insuficiencia de fondos, de esos hechos surge la presunción *juris tantum* de que el librador del cheque sabía en el momento de expedirlo que no sería pagado. Para proteger a aquellas personas que hubieren librado un cheque creyendo de buena fe que tenían fondos suficientes para su pago, la ley (sección 4, supra) concede al librador un plazo no menor de diez días, contados desde la fecha en que le fuere notificada la falta de pago, para hacer efectivo el importe del cheque. Y si el librador dejare expirar el plazo sin recoger el cheque, entonces surgirá en su contra como presunción controvertible la de que su propósito

al expedir el cheque fué el de defraudar a su acreedor (sección 5, supra).

Cuando A libra un cheque y lo entrega a B, el primero realmente está prometiendo y representando al segundo que su orden de pago será atendida por el librado con quien tiene fondos suficientes o crédito abierto. Por eso la ley dispone que el mero hecho de expedir y entregar el cheque y el rechazamiento del mismo por el girado, constituirá evidencia prima facie de que el librador tenía conocimiento de la insuficiencia de fondos o falta de crédito. (Sección 2, supra.)

No son aplicables a nuestro juicio las reglas de evidencia que estamos discutiendo a un caso como el presente en el que en el momento de entregar el cheque a su acreedor el librador le informa que no tiene ni fondos suficientes ni crédito abierto para que el cheque pueda ser pagado a su presentación y le ruega no presentarlo hasta que él pueda depositar los fondos necesarios para su pago. ¿Cómo es posible que se presuma la existencia de un propósito de defraudar en el momento de entregar el cheque, cuando la evidencia demuestra que la persona que lo recibió no pudo en manera alguna ser defraudada por haber sido expresamente informada por el mismo librador de que el cheque no sería pagado por falta de fondos?

El fraude, sinónimo de engaño, consiste en la falsa representación, mediante palabras o por actos, de hechos materiales, por la cual una persona de razonable discreción y confianza es inducida a actuar a su perjuicio; en la supresión de hechos materiales que una persona está legalmente obligada a revelar a otra. Véanse: 1 Story Equity Jur. sec. 186, y C. 6; Bouvier's Law Dictionary, vol. 1, pág. 843.

No hubo en el presente caso intento o propósito de defraudar. El acusado al entregar el cheque al representante de su acreedor reveló a éste el hecho de que él no tenía fondos suficientes para su pago. No se consumó ni podía consumarse fraude alguno contra la compañía acreedora, porque ésta aceptó el cheque a sabiendas de que no había fon-

dos en el banco para su pago y que el pago se haría cuando y si al librador le fuera posible depositar fondos para cubrirlo. La compañía acreedora no ha sufrido perjuicio alguno como consecuencia del libramiento del cheque, pues éste fué expedido para abonar a una deuda preexistente y no en pago de efectos comprados en el momento de su expedición.

El caso de *State* v. *Avery,* 23 A.L.R. 453, base de la teoría del fiscal, no es a nuestro juicio de aplicación al caso de autos. El estatuto de Kansas castiga como delito el mero hecho de entregar a otra persona un cheque cuando el que lo entrega sabe que no tiene fondos suficientes para su pago. Avery fué acusado de haber dado un cheque sin tener fondos suficientes y presentó una moción para el sobreseimiento de la acusación por el fundamento de que en ella no se alegaban hechos suficientes para constituir un delito público. De la opinión en dicho caso copiamos lo que sigue:

"El acusado alega que el criterio de culpabilidad en el derecho penal es la intención criminal, y el estatuto no requiere la intención criminal para constituir el delito (*felony*) denunciado. Esta alegación es demasiado amplia. El cheque sin valor debe ser hecho voluntariamente, sabiendo en el momento de hacerlo que no hay fondos en depósito para pagarlo. Fuera de eso, la Legislatura puede, para la protección del interés público, requerir que las personas actúen a su riesgo, y puede castigar la ejecución de un acto prohibido sin tomar en consideración el conocimiento, la intención, el motivo o la torpeza moral del actor. No hay objeción constitucional en contra de tal legislación, y la determinación de su necesidad está dentro de las facultades de la legislatura. Si la legislatura ha aprobado o no tal estatuto, es materia de interpretación."

Procediendo en seguida a interpretar el estatuto en cuestión, la Corte Suprema de Kansas se expresó así:

"Sostiene el acusado que el delito de dar un cheque sin fondos está relacionado con el grupo de delitos de falsa representación e impostura, y en consecuencia, que para que exista tal delito es necesario que el cheque haya sido dado con la intención de defraudar, y que el fraude debe realizarse mediante la obtención de dinero o alguna cosa de valor. Que la legislatura no estaba añadiendo a la

lista de engaños y fraudes castigables aparece claramente de la sección interpretativa del estatuto, y del hecho de que la legislatura aprobó en la misma sesión la ley llamada 'Bogus Check Act.' El propósito del estatuto fué el de desalentar los sobregiros y la resultante mala práctica bancaria, acabar con la práctica del 'check kiting', y en general evitar al comercio, a los negocios y a la banca el daño que les causa la circulación de cheques sin valor. Aun cuando el estatuto tiende a suprimir el fraude que se comete por medio del método de cheques sin valor, los males a que nos hemos referido son todos muy distintos de aquellos resultantes del fraude, y el estatuto debe ser considerado como creador de una nueva y distinta ofensa. ".

"En este caso parece claro que el propósito fraudulento fué intencionalmente omitido al hacer la enumeración de los elementos del delito."

En el caso de *Commonwealth* v. *McCall*, 186 Ky. 301, 217 S. W. 109, la Corte Suprema de Kentucky, interpretando un estatuto similar al nuestro, dijo:

"Esta sección crea un nuevo y distinto delito, cuya comisión se realiza al dar un cheque *con el propósito de defraudar* sobre un banco en el cual el librador sabe que no tiene fondos suficientes para su pago; y no es esencial para constituir un delito bajo esta sección, que el librador del cheque haya hecho alguna falsa representación o manifestación con referencia al estado de su cuenta en el banco a cargo del cual se ha expedido el cheque, o en relación con la transacción. No es necesario que la persona a quien se da el cheque haga alguna pregunta ni tampoco que el que lo expide dé informes voluntariamente. El mero acto de entregar tal cheque con el *propósito de defraudar* constituirá el delito, y el propósito de defraudar será evidente siempre que la persona a quien se da el cheque hubiera entregado dinero, propiedades u otra cosa de valor."

El propósito evidente del estatuto de Kansas fué el de perseguir y acabar con la mala práctica de expedir cheques sin fondos, aun cuando el librador no hubiese tenido el propósito de engañar o defraudar a la persona a favor de quien expidiera el cheque. Por eso el legislador eliminó el "propósito de defraudar" de la definición del delito. El propó-

sito del estatuto de Kentucky, así como el nuestro, es perseguir y castigar la expedición de cheques sin fondos como medio para defraudar o engañar a la persona que lo recibe, obteniendo de ella dinero o propiedades.

El "propósito de defraudar" forma parte y es un elemento esencial del delito que define y castiga la sección 1ª de la Ley núm. 26, supra. Y siendo un elemento esencial del delito, debe ser alegado en la acusación y establecido por la prueba. Véanse: *State* v. *Alphonse,* 154 La. 950, 35 A.L.R. 380; *McBride* v. *State,* (Miss.) 104 So. 454, 43 A.L.R. 49.

La jurisprudencia que hemos examinado sostiene que cuando en la definición del delito de dar un cheque sin fondos se incluye el requisito del "propósito de defraudar," la médula (*gist*) de la ofensa es el conocimiento del librador del cheque en el momento de expedirlo de la insuficiencia de fondos y el propósito de defraudar. *Re Scott,* 85 Cal. App. 170, 259 P. 101; *People* v. *Radich,* 111 Cal. App. 779, 294 P. 1; *Re Leuschen,* 134 Cal. App. 246, 25 P. (2d) 243; 95 A.L.R. 489.

Las presunciones que establecen las secciones 2 y 5 de nuestro estatuto, supra, quedaron controvertidas por el hecho probado y admitido de que el acusado al tiempo de entregar el cheque informó al representante de la Compañía Nestle en cuanto a la insuficiencia de sus fondos. Y no estando sostenida la alegación del "propósito de defraudar" por ninguna evidencia independiente, la convicción del acusado no puede sostenerse. *Padgett* v. *State,* 24 Ala. App. 133, 131 So. 3 (95 A.L.R. 490); *Turner* v. *Brenner,* 121 S. E. 510, 35 A.L.R. 380; *People ex rel. Indig.* v. *Kapitofsky,* 144 Misc. (N. Y.) 543, 258 N. Y. S. 861; 95 A.L.R. 491 y la nota VIII a la página 494.

*Por las razones expuestas debe revocarse la sentencia y absolverse al acusado.*