RAMÓN VALENTÍN CRUZ, peticionario y apelante, *v.* EMILIO TORRES MARRERO, Alcaide interino de la Cárcel de Distrito de Aguadilla, demandado y apelado.

Número 12184.

*Reasignado:* 1 de mayo de 1958. *Resuelto:* 18 de junio de 1958

*E. Alcaraz Capablanca*, abogado del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo, Arturo Estrella, Secretario de Justicia Auxiliar, Alfredo Archilla Guenard* y *William Fred Santiago, Fiscal* y *Fiscal Auxiliar del Tribunal Supremo, respectivamente*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El policía secreto Rosario Maurás presentó siete denuncias contra Ramón Valentín Cruz ante el Tribunal de Distrito, Sala de Aguadilla, el día 14 de noviembre de 1955, imputándole sendas infracciones de las secs. 1 y 4 de la Ley núm. 26, aprobada el 25 de abril de 1934—33 L.P.R.A. secs. 1851 y 1854—que castiga la emisión y entrega de cheques sobre bancos donde el girador no tenga suficientes fondos o crédito para su pago. (¹)

Con excepción de las respectivas fechas, números y cantidades de los cheques, el contenido literal de cada denuncia, en lo pertinente, es como sigue:

"Que en . . . , y en Aguadilla, . . . el referido acusado Ramón Valentín Cruz, allí y entonces, de manera ilegal, voluntaria y

---

(¹) "Sección 1.—Cualquier persona que, con el propósito de defraudar a otra, haga, extienda, endose o entregue un cheque, giro, letra u orden para el pago de dinero, a cargo de cualquier banco, u otro depositario, sabiendo al hacerlo, que el emisor o girador no tiene suficientes fondos o créditos establecidos en dicho banco o depositario para el pago total del cheque, giro, letra u orden, a la presentación del mismo, será culpable de delito menos grave, y convicta que fuere, será castigada con multa que no será menor del doble del importe de dicho cheque, giro, letra u orden, o a sufrir un día de cárcel, por cada dólar o fracción que deje de satisfacer, o ambas penas a discreción del tribunal."

"Sección 4.—Ninguna persona será castigada de acuerdo con esta Ley, a menos que se pruebe, a satisfacción de la corte, que el *tenedor* del cheque, giro, letra u orden, *o su agente*, ha avisado personalmente al girador y al endosador *para que pague al tenedor o a su agente, en la dirección que se indicará en el aviso*, el importe del cheque, giro, letra u orden, dentro de un plazo no menor de diez (10) días, si el girador o endosador, a quien se dirige el aviso, residiere en la localidad del tenedor y no menor de quince (15) días, si residiere en otro municipio de la isla. Dicho término se computará desde la fecha del aviso al girador o endosante, del giro, cheque, letra u orden no pagada." (Bastardillas nuestras.)

maliciosamente, a sabiendas y con la intención criminal y con el propósito criminal de defraudar al señor Luis Oyola Torres, como lo defraudó . . . expidió el cheque número . . . por la cantidad de . . . . , firmado de su puño y letra contra el Banco Crédito y Ahorro Ponceño, Sucursal de Mayagüez, P. R., a favor del portador y el mismo le fue devuelto por el referido Banco porque no tenía fondo. Que en los momentos que el acusado expidió dicho cheque sabía que el mismo no tenía fondo. Fue debidamente notificado que dicho cheque había sido devuelto por el Banco porque no tenía fondo. El día 18 de octubre de 1955, el Lcdo. Héctor Reichard, a nombre y en representación del perjudicado Luis Oyola Torres, envió una carta certificada al acusado informándole que el día 10 de octubre de 1955 le había requerido por teléfono el pago de dicho cheque y que el acusado había prometido pagar. Que el día 11 de octubre de 1955 a las 9:00 A.M. volvió a requerirle personalmente en presencia del Alcaide de Cárcel de Aguadilla, Puerto Rico, y del denunciante para que le pagara dicha cantidad de dinero y el acusado prometió que si le daba la oportunidad de ir a Mayagüez le pagaría y le fue dada tal oportunidad y no pagó. Que el único interés que tenía dicho abogado era que el acusado le pagara al perjudicado Luis Oyola Torres dicha cantidad de dinero y no pagó. Dicho abogado esperó 20 días después de haberle enviado dicha carta certificada al acusado. El cheque fue ocupado y el mismo se pone como evidencia para la Hon. Corte de Distrito de Aguadilla, Puerto Rico, en unión a una copia de la carta certificada."

El 16 de diciembre de 1955, ante el juez de distrito, Juan B. Zamora, se vieron conjuntamente los siete casos. Representó a El Pueblo un fiscal privado. El denunciado estuvo representado por abogado. Al comienzo del juicio se formuló oralmente una moción solicitando la inhibición del juez por parentesco entre éste y el abogado del perjudicado. Se desestimó tal moción. Sometidos los casos, el juez declaró culpable a Ramón Valentín Cruz imponiéndole el pago de siete multas que totalizaron $6,064.08, y en defecto del pago de las respectivas multas un día de cárcel por cada dólar que dejara de pagar no excediendo esta pena de 90 días en cada caso.(2)

---

(2) Los siete cheques envueltos en los casos sumaban $3,032.04.

Los casos fueron apelados para ante el Tribunal Superior, Sala de Aguadilla, el cual, el día 23 de abril de 1956, desestimó las apelaciones por no haberse notificado los escritos de apelación al fiscal privado que actuó ante el tribunal de distrito.

El día 25 de mayo de 1956 Ramón Valentín Cruz presentó ante el Tribunal Superior, Sala de Aguadilla, una petición interesando la expedición de un auto de hábeas corpus contra Emilio Torres Marrero, Alcaide Interino de la Cárcel de Distrito de Aguadilla, alegando que éste lo tenía ilegalmente encarcelado y privado de su libertad por los siguientes motivos:

"(a) Porque el peticionario fue sentenciado por el Tribunal de Distrito de Puerto Rico, Sala de Aguadilla, mediante un procedimiento en abierta contravención a la Constitución del Estado Libre Asociado de Puerto Rico, en cuanto no se le celebró un juicio imparcial y justo ya que el magistrado que intervino en dichos casos está dentro del tercer grado de consanguinidad con uno de los abogados interesados en la acción contra el peticionario, y del mismo expediente surge que el peticionario fue objeto de persecución habiéndose ordenado su encarcelación original con una fianza en violación de ley y antes de que hubiera la más remota posibilidad de que existiera causa probable.

"(b) Porque en la vista de los casos en contra del peticionario no se probó a éste la comisión de delito público alguno."

Fue expedido el auto. La vista del recurso se celebró el 13 de julio de 1956, presidiendo el tribunal el juez Herminio Rodríguez Quiñones. El 17 de agosto siguiente dictó sentencia declarando sin lugar la petición en los siguientes términos:

"Por el resultado de la prueba introducida en la vista de este caso, oída la cinta magnetofónica del caso en el tribunal inferior, considerada la prueba practicada en el juicio de las causas de que trata la petición inicial y vista la jurisprudencia en *Ex parte Lebrón*, 16 D.P.R. 662; *Ex parte Sánchez*, 18 D.P.R. 177; *Ex parte Huertas et al.*, 22 D.P.R. 524; *Hernández versus Meléndez, Alcaide*, 42 D.P.R. 338; *Pueblo versus Burgos*,

18 D.P.R. 72, y *Ex parte Le Hardy,* 17 D.P.R. 1024, se resuelve declarar y se declara sin lugar el presente recurso de hábeas corpus y, en su consecuencia, se ordena que el peticionario Ramón Valentín Cruz sea ingresado en la cárcel de distrito de Aguadilla, donde extinguirá las sentencias a que se refiere dicha petición."

De esa sentencia apeló el peticionario. En su alegato sostiene que el tribunal apelado cometió dos errores, el primero, al no permitirle presentar prueba de que fue privado del derecho a un juicio imparcial y justo, y el segundo, al resolver que la prueba era suficiente en derecho para condenarlo el Tribunal de Distrito.

■■ Sostiene ante nos el apelante que el Tribunal Superior, Sala de Aguadilla, no le permitió presentar evidencia para sustanciar el fundamento "(a)" de su petición, por el que expuso que ante el Tribunal de Distrito, Sala de Aguadilla, "no se le celebró un juicio imparcial y justo."

Al comenzar la vista del recurso de hábeas corpus, el fiscal solicitó su desestimación alegando que el mismo no procedía para revisar los errores de procedimiento a que se refería la petición. Discutida la procedencia del recurso, el juez dio la razón al fiscal respecto al fundamento "(a)" de la petición y se la negó en cuanto al "(b)", resolviendo considerar únicamente si en el juicio que tuvo el peticionario "no se probó a éste la comisión de delito público alguno." Consecuentemente, el tribunal de instancia no permitió al peticionario la presentación de evidencia que tendiera a sustanciar su alegación de que ante el tribunal de distrito no se le había celebrado un juicio imparcial y justo y de que "había sido objeto de persecución."

La revisión cuidadosa que hemos hecho de todos los autos del caso nos ha revelado la existencia de una serie de hechos de la que consideramos que deben exponerse los siguientes:

1. Ramón Valentín Cruz fue arrestado en Mayagüez y llevado bajo arresto a, e ingresado en la Cárcel de Distrito de Aguadilla, por el detective Rosario Maurás, el día 10 de

octubre de 1955, y se le tuvo allí encarcelado hasta el siguiente día, (³) sin que previamente se determinara por un magistrado la existencia de causa probable. (⁴)

2. Fue requerido para el pago de los siete cheques por el Lic. Héctor Reichard, como abogado de Oyola Torres: el día 10 de octubre de 1955 mientras se encontraba ilegalmente arrestado por Maurás en la fiscalía de Mayagüez; el día 11 del mismo mes, mientras se encontraba ilegalmente encarcelado en Aguadilla, y en el día 18, también del mismo mes, por carta certificada, (⁵) sin que en ningún momento se pro-

---

(³) No se sabe cuántos días adicionales él pudo haber estado así detenido. El alcaide lo dejó salir el día 11 de octubre porque él prometió al Lic. Reichard que iría a Mayagüez a buscar dinero para pagar el importe de los cheques. Allí no hizo gestiones en busca del dinero, pero prestó una fianza por $5,000. No obstante la prestación de fianza, el detective volvió a llevarlo a la cárcel de Aguadilla en el mismo día 11 de octubre y momentos después lo excarcelaron. (En el juicio explicó Valentín Cruz que la promesa de buscar el dinero fue un pretexto que se le ocurrió para lograr salir de la cárcel y prestar fianza.)

(⁴) Los casos fueron sometidos al juez de distrito de Aguadilla el 14 de noviembre siguiente—45 días después—y en ese día, parece, que se determinó la existencia de causa probable.

(⁵) Dicha carta lee como sigue:

"*Registered Mail—Return Receipt Requested*—18 de octubre de 1955— Sr. Ramón Valentín Cruz—Calle Prolongación Roosevelt Núm. 24—Mayagüez, P. R.—Estimado amigo: Conforme a lo que dispone la Sección 4 de la Ley número 26 de 1934, le advierto, en mi carácter de representante de don Luis Oyola Torres, que transcurridos quince (15) días desde el recibo de ésta, si usted no paga el importe de los cheques relacionados a continuación, procederemos conforme determina la ley. Los cheques son los siguientes:

| Número del cheque | Fecha | Cantidad |
|---|---|---|
| 1268 | Sept. 26/55 | $361.50 |
| 1269 | Sept. 27/55 | $900.00 |
| 1271 | Sept. 28/55 | $777.15 |
| 1273 | Sept. 29/55 | $215.89 |
| 1275 | Sept. 30/55 | $225.87 |
| 1276 | Oct. 1ro/55 | $269.75 |
| 1279 | Oct. 3/55 | $281.88 |

Total........... $3,032.04

(Todos contra el Banco Crédito y Ahorro Ponceño)

"Quiero recordarle que yo le requerí a usted el pago de estas cantidades el día 10 de octubre por teléfono que usted contestó de la oficina

bara, o intentara probar, en el único juicio que se celebró ante el Tribunal de Distrito, Sala de Aguadilla, que en las tres veces en que fue requerido o en alguna de ellas, Oyola Torres o su abogado fueran los tenedores o poseedores de todos o parte de esos cheques. Los cheques nunca fueron endosados, presentados o puestos al cobro por Oyola Torres. Éste declaró que se los había cambiado por dinero efectivo que pertenecía a la Corona Brewing Co. Esta entidad fue la que depositó los cheques en su cuenta con un banco de Santurce.

3. Fue arrestado por segunda vez el día 21 de noviembre de 1955, en virtud de un mandamiento de arresto que no estaba suscrito por magistrado alguno.

4. Fue sometido a juicio (1) sin que se le dieran copias de las denuncias formuladas en su contra por el detective, a pesar de que el juicio, por ese motivo, se había suspendido una vez, (2) sin que se le leyeran esas denuncias al comenzar el juicio y (3) sin que se le permitiera hacer alegación contra las mismas.

5. Fue juzgado, convicto y sentenciado por un juez que era tío del abogado del supuesto perjudicado Oyola Torres, a pesar de que antes del comienzo del juicio, y tan pronto como el abogado del apelante tuvo conocimiento de ese parentesco, solicitó su inhibición por ese motivo. En cada denuncia se expuso que dicho abogado—el sobrino del juez—había sido la persona que requirió al denunciado para el pago de los cheques. La eficacia legal de ese requerimiento hecho

---

del Fiscal de Mayagüez, Lcdo. Moreda y que usted prometió pagarlo; el día 11 de octubre de 1955, a las 9:00 A.M. le volví a requerir el pago de los referidos cheques en presencia del Alcaide de la Cárcel de Distrito de Aguadilla y del Detective Maurás y usted prometió pagar si se le daba la oportunidad de ir a Mayagüez y que se le dio tal oportunidad. Fue usted a Mayagüez y no pagó nada. El único interés que tengo en este caso es el que usted pague este dinero al señor Luis Oyola Torres, a quien represento. Sin otro particular, quedo, Muy atentamente, (Firmado) Héctor Reichard.—HR/cer."

por el abogado-sobrino tenía que determinarla el juez-tío en cada caso. (⁶)

Al peticionario en la vista del hábeas corpus no se le permitió probar: (1) que dicho juez acostumbraba inhibirse en todos los casos en que actuaba su sobrino como abogado; (2) que su sobrino, en representación de Oyola Torres, estaba tramitando una acción en cobro de dinero contra el denunciado, y (3) que en la vista de los casos ante el Tribunal de Distrito estuvo presente dicho abogado cooperando con el fiscal privado.

6. Fue sentenciado en el caso número 55–2237, por expedir el cheque núm. 1269, por $900, el 27 de setiembre de 1955, a pesar de que la evidencia ofrecida por El Pueblo demostró que en esa fecha el denunciado depositó en el banco girado la suma de $1,575 y pudo cobrarse contra esa suma depositada si oportunamente se hubiera presentado al cobro ese cheque de $900.

7. Fue sentenciado en los siete casos por el testimonio esencial de un empleado del banco, cuyo nombre no figuraba en las denuncias, no obstante haberse hecho la oportuna oposición por el fundamento de sorpresa. (⁷)

---

(⁶) Consta en el récord lo siguiente:

"Lcdo. Alcaraz: En relación con esos mismos hechos se encuentra radicada en el Tribunal Superior de Aguadilla una acción civil en cobro de cantidad, cuya acción fue radicada por el Lcdo. Héctor Reichard; según información y creencia, señor Juez, aquí tenemos la copia de la demanda firmada por el Lcdo. Reichard y la orden firmada por el Juez Willis Ramos Vázquez. Según información, digo información porque no sabemos si es así o no, el Honorable Magistrado tiene grados de parentesco con el Hon. Compañero Héctor Reichard; no sabemos si esto es cierto o no. Pero si ésa es la situación y apareciendo también de las denuncias que el compañero Héctor Reichard tuvo intervención en estos casos, si esa fuera la situación, solicitaríamos del Hon. Magistrado que preside esta Sala que se inhiba de actuar en estos casos.

"(Juez) Bueno . . . el Tribunal dice que es tío de Héctor Richard, pero que es tardía esta forma y que Héctor Reichard no tiene intervención alguna en la acción criminal. Siendo independiente la acción civil, el tribunal no se inhibe, decide no inhibirse en este caso."

Mientras el abogado defensor exponía los fundamentos de inhibición, fue interrumpido por el Juez y éste le dijo: "Estamos perdiendo tiempo."

(⁷) No obstante la objeción del abogado defensor, el juez de distrito, sin resolverla, permitió declarar a ese testigo fundamental.

8. Fue juzgado conjuntamente en los siete casos sin que en ello consintiera personalmente o por medio de su abogado. ([8])

9. Fue privado en el recurso de hábeas corpus ante el Tribunal Superior, de su derecho a presentar evidencia para sustanciar su alegación de que había sido "sentenciado por el Tribunal de Distrito . . . mediante un procedimiento en abierta contravención a la Constitución del Estado Libre Asociado de Puerto Rico, en cuanto en tanto no se le celebró un juicio imparcial y justo . . ." y de que " . . . fue objeto de persecución. . . ."

El tribunal de instancia, en su breve sentencia hizo constar que había "oído la cinta magnetofónica del caso en el

---

([8]) Considerada en conjunto la evidencia presentada por ambas partes ante el Tribunal de Distrito, de la misma surge un conflicto en cuanto a los fines y propósitos con que fueron emitidos, entregados y cambiados los cheques. Ese conflicto se resolvió en contra del acusado.

Oyola Torres y Valentín Cruz eran amigos. Trabajaban, el primero como encargado de la oficina en Aguadilla de la Corona Brewing Corporation y el segundo como un simple empleado en esa ciudad, de la Coca Cola Bottling Co. Sus respectivos sitios de trabajo quedaban muy cerca. El apelante tenía su residencia en Mayagüez y mantenía una cuenta corriente con el Banco Crédito y Ahorro Ponceño, sucursal de Mayagüez. Durante los meses de setiembre y octubre de 1955, el peticionario libró unos 30 ó 40 cheques contra el mencionado banco, todos a la orden de "cash", que montaban a unos $10,000. Esos cheques los hacía efectivos Oyola Torres con dinero de su patrona Corona Brewing Corporation y después, sin endosarlos, los remitía a su patrona que los depositaba, endosados por ella, en su cuenta con The Chase Manhattan Bank, sucursal de Santurce. Los cheques fueron honrados con excepción de los últimos siete que se relacionan en la carta de requerimiento transcrita en el escolio 5.

Conforme al testimonio prestado por Oyola Torres, su amigo Ramón Valentín Cruz iba donde él y le "pedía que le cambiara los cheques" y él entonces se los cambiaba por dinero efectivo en su poder de la Corona Brewing Corporation. En su defensa Valentín Cruz declaró que Oyola Torres era el que iba donde él y le solicitaba expedir los cheques para facilitar el envío de fondos a la Corona Brewing Corporation; que Oyola Torres, generalmente, le entregaba el importe de cada cheque, él lo expedía y luego depositaba ese importe en el banco; que las relaciones entre ambos llegaron a tal grado de confianza que a veces él, Valentín Cruz, firmaba cheques en blanco y luego los llenaba Oyola Torres; que, en cuanto a los últimos siete cheques, éste no le entregó dinero en efectivo alguno y por eso no pudieron cobrarse. (Obsérvese que los últimos siete aparecen emitidos en días laborables sucesivos.)

Tribunal inferior" y, además, que había considerado "la prueba practicada en el juicio de las causas de que trata la petición inicial."

Los seis casos de este Tribunal Supremo que menciona sostienen el principio de que el recurso de hábeas corpus no tiene el mismo propósito que un recurso de apelación o de certiorari, y que no puede invocarse para revisar errores e irregularidades. Desde que se estableció el hábeas corpus en Puerto Rico, (⁹) este Tribunal, no obstante la amplitud con que lo ha aplicado, se ha negado a conceder el auto para corregir cuestiones de derecho o de hecho a menos que hubieran sido de carácter jurisdiccional o que hubiera estado en las mismas envuelta alguna violación de derechos constitucionales o estatutarios (¹⁰) que conlleve la nulidad de la sentencia.

---

(⁹) Véanse: Orden General núm. 71 de 1899; Circular núm. 17 de 3 de julio de 1899; Sec. 35, Ley Foraker de 12 de abril de 1900; Arts. 469–500, Código de Enjuiciamiento Criminal de 1902; Art. 48, Ley Jones de 2 de marzo de 1917; Ley núm. 600, denominada "Ley de Relaciones Federales con Puerto Rico", de 3 de julio de 1950, y los Artículos II (13) y V (5) de nuestra Constitución.

(¹⁰) *Ex parte Mauleón*, 4 D.P.R. 123 (1903)—si conforme a la ley entonces en vigor, el acusado renunció al juicio por jurado—; *Ex parte Soldini*, 4 D.P.R. 168 (1903)—si el mero temor de ser encarcelado es suficiente para su confesión—; *Ex parte Torres*, 4 D.P.R. 303 (1903)—cuando el acusado por medio de una simple moción, puede obtener el remedio adecuado—; *Ex parte Cintrón*, 5 D.P.R. 90 (1904)—error por discrepancia entre declaraciones prestadas durante el sumario fiscal y las prestadas en juicio—; *Ex parte Bird*, 5 D.P.R. 247 (1904)—la legalidad o ilegalidad del nombramiento del juez sentenciador—; *Ex parte Rosa*, 8 D.P.R. 132 (1905)—revisión de los procedimientos y prueba para determinar la culpabilidad o inocencia del acusado—; *Pueblo* v. *Muñoz*, 8 D.P.R. 424 (1905)—defecto de forma de un mandamiento de arresto—; *Ex parte Llera*, 11 D.P.R. 427 (1906)—meras deficiencias en mandamiento de encarcelación—; *Ex parte Pesquera*, 17 D.P.R. 736 (1911)—revisión de hechos constitutivos de desacato—; *Ex parte Le Hardy*, 17 D.P.R. 1024 (1911)—la justicia o injusticia de una resolución castigando a un padre que ha desobedecido una orden sobre custodia de sus hijos—; *Ex parte Burgos*, 18 D.P.R. 72 (1912)—consideración de una defensa alegada y resuelta por el tribunal inferior sobre exposición anterior—; *Ex parte Sánchez*, 18 D.P.R. 177 (1912)—impugnación de la validez de una sentencia dictada por tribunal distinto de aquel en que se cometió un hurto de mayor cuantía—; *Ex parte Plata*, 22 D.P.R. 188 (1915)—si la ausencia de sala,

Cuando ha precedido una convicción, el recurso de hábeas corpus constituye un ataque colateral contra la sentencia. Es cierto que la regularidad de los procedimientos que culminaron en la misma se presume; pero la jurisdicción inicial de un tribunal sentenciador puede perderse o excederse en el curso de esos procedimientos y resultar éstos viciados de nulidad al quebrantarse sustancialmente las garantías constitucionales del acusado. La tendencia moderna judicial favorece el ensanchamiento de la esfera de investigación en el recurso para conservar las salvaguardias constitucionales de la libertad humana.(¹¹)

durante el juicio, del secretario y el alguacil, invalida el procedimiento—; *Ex parte Alers*, 22 D.P.R. 309 (1915)—si la declaración de un cómplice fue suficientemente corroborada—; *Ex parte Colón*, 34 D.P.R. 88 (1925)— si era excesiva la pena impuesta dentro de los límites estatutarios—; *Medina* v. *Géigel*, 44 D.P.R. 548 (1933)—si el vencimiento del término para presentar denuncia enmendada fue fatal—; *González* v. *Saldaña*, 58 D.P.R. 859 (1941) y *Veguilla* v. *Saldaña*, 58 D.P.R. 878 (1941)—la procedencia de la defensa de prescripción—; *Ex parte Dones*, 60 D.P.R. 181 (1942)— el carácter de concurrente de una sentencia apelada—; *López* v. *Saldaña*, 60 D.P.R. 313 (1942)—la suspensión del juicio—; *Ex parte Ferrá*, 61 D.P.R. 401 (1943)—la inocencia o culpabilidad del peticionario—; *Morales* v. *Saldaña*, 63 D.P.R. 59 (1944)—la falta de una privación real y efectiva de asistencia de abogado—; *Vázquez* v. *Riera*, 70 D.P.R. 218 (1949)— contención que no constituye ataque a la validez de la sentencia—; *González* v. *Jones*, 79 D.P.R. 44 (1956)—apreciación errónea de la evidencia.

(¹¹) Citando, en parte, el caso de *Johnson* v. *Zerbst*, 304 U.S. 458, en *Ex parte Hernández Laureano*, 54 D.P.R. 416, 422, (1939), dijimos:

"Contestando la objeción de que el hábeas corpus no puede ser usado como un recurso para la revisión de errores e irregularidades cometidos durante el juicio, expresóse así la Corte Suprema:

" '. . . Es cierto que el hábeas corpus no puede ser usado como un medio para la revisión de errores de derecho e irregularidades—cometidos durante la tramitación del juicio; y que tampoco puede ser usado como apelación. Estos principios, sin embargo, deben ser interpretados y aplicados con el propósito de conservar—y no destruir—las garantías constitucionales de la vida y de la libertad humanas. El campo de investigación en procedimientos de hábeas corpus ha sido ensanchado—no reducido— desde la adopción de la Enmienda Sexta. En tal procedimiento, sería claramente erróneo limitar la investigación a los procedimientos y sentencia de la corte sentenciadora, y la corte ante la cual se ha hecho la petición tiene facultad para inquirir acerca de la jurisdicción de la corte inferior, ya sea sobre la materia de la acusación o sobre la persona, aun cuando

476

El tribunal apelado, después de haber oído la cinta magnetofónica y considerado "la prueba practicada en el juicio de las causas de que trata la petición inicial", declaró sin lugar el recurso, resolviendo implícitamente que se trataba de meras irregularidades de procedimiento que no podían revisarse en el recurso de hábeas corpus.

No estamos conformes con la sentencia del tribunal de instancia. Es cierto que algunos de los errores cometidos por el Tribunal de Distrito no constituyen fundamento legal suficiente para declarar inválidas las sentencias dictadas contra Ramón Valentín Cruz; pero también es cierto que se cometieron otros cuya gravedad conlleva la nulidad de todas esas sentencias. Veamos.

La falta de la previa determinación de causa probable para el arresto efectuado el 10 de octubre de 1955, y el segundo arresto del 21 de noviembre de 1955 en virtud de un mandamiento sin firma de magistrado, si bien convirtieron sus detenciones en dos arrestos ilegales, [12] dejaron de ser motivos para ordenar su excarcelación mediante un recurso de hábeas corpus una vez que él prestó fianzas y fue juzgado y convicto en los siete casos. [13] El permitir el Tribunal de Distrito declarar al testigo cuyo nombre no figuraba en las denuncias, fue una cuestión de admisión de evidencia que caía dentro de la sana discreción del tribunal, y el denunciado repreguntó ampliamente a ese testigo; si bien alegó sorpresa, en ningún momento demostró su existencia, ni que no estaba preparado para confrontarse con ese testigo; tam-

esa investigación envuelva un examen de hechos fuera de pero no inconsistentes con el récord.' (Citas.)"

Véanse Ferris, *"The Law of Extraordinary Remedies"*, págs. 40–41; 25 Am. Jur., Habeas Corpus 49; 33 C.J.S., Habeas Corpus 21, y *Jiménez v. Jones*, 74 D.P.R. 260 (1953).

[12] *Pueblo* v. *Soto*, 71 D.P.R. 830 (1950); *Pueblo* v. *Decós*, 62 D.P.R. 148 (1943); *Ex parte Colón*, 8 D.P.R. 344 (1905). Art. 25, Código de Enjuiciamiento Criminal.

[13] *Jackson* v. *Warden of the Maryland Penitentiary*, 125 A.2d 840, 841 (1956).

poco solicitó la suspensión del juicio.([14]) El haberse celebrado conjuntamente la vista en sus méritos de las siete denuncias, se debió al consentimiento implícito que para ello prestó su abogado al no solicitar que se celebraran separadamente cuando el fiscal privado le preguntó si quería "verlos por separado o estipulamos que los siete casos se vean conjuntamente y con la misma prueba", procediéndose a su celebración conjuntamente.

■■ La variación o discrepancia que el peticionario señala entre lo alegado en la denuncia y lo probado por la evidencia de El Pueblo en el sentido de que aquélla menciona a Luis Oyola Torres como la persona defraudada y de ésta resultó que el dinero con el cual se cambiaron los siete cheques pertenecía a la Corona Brewing Corporation, no es material. Esos cheques fueron emitidos a la orden de "cash". Los elementos esenciales del delito definido por la Ley núm. 26 de 1934, que deben establecerse (en unión al indispensable requerimiento de pago a que se refiere su sec. 4), son: (1) el hacer, extender, endosar o entregar un cheque, giro, letra u orden de pago de dinero, a cargo de cualquier banco; (2) el conocimiento, al hacerlo, de que el emisor o girador no tiene suficientes fondos para el pago y (3) el propósito de defraudar. Bajo este estatuto la pertenencia técnica del dinero obtenido mediante el propósito de defraudar, carece de importancia. La ley no requiere que el propósito de defraudar exista en relación con determinada persona ni que el nombre de ésta se mencione.([15])

---

([14]) *Pueblo* v. *Dones*, 56 D.P.R. 211 (1940); *Pueblo* v. *Avilés*, 50 D.P.R. 527 (1936); *Pueblo* v. *Egipciaco*, 49 D.P.R. 411 (1936); *Pueblo* v. *Pagán*, 47 D.P.R. 673 (1934); *Pueblo* v. *Pérez*, 46 D.P.R. 768 (1934); *Pueblo* v. *Ayala*, 38 D.P.R. 423 (1928); *Pueblo* v. *Román*, 18 D.P.R. 219 (1912).

([15]) *State* v. *Pilling*, 53 Wash. 464, 102 Pac. 230 (1909). En *Pueblo* v. *Cuevas*, 54 D.P.R. 301, 303 (1939) se resolvió que el estatuto "consigna como requisito o elemento esencial del delito—'gist'—el de que la expedición, endoso o entrega del cheque haya sido hecha con el propósito de defraudar a otra persona." Cf. *People* v. *Oster*, 129 Cal. App. 2d 688, 278 P.2d 39 (1955).

■ Consideramos, por otro lado, que los siguientes errores cometidos viciaban de nulidad todas las siete sentencias dictadas contra el peticionario:

1. El no probarse que en las respectivas fechas de los tres requerimientos de pago, Luis Oyola Torres fuera el tenedor de los cheques o el agente de tal tenedor y que en los respectivos avisos se diera la dirección en que se pagaría al tenedor o a su agente.

El estatuto envuelto en estos casos a este respecto es claro y terminante:

"*Ninguna persona será castigada de acuerdo con esta Ley*, a menos que se pruebe, a satisfacción de la corte, que el *tenedor* del cheque . . . ha avisado personalmente al girador . . . para que pague *al tenedor, o a su agente, en la dirección que se indicará en el aviso,* el importe del cheque . . . ." (¹⁶)

Las denuncias no decían quién o quiénes eran los tenedores o el tenedor de los cheques, ni quién o quiénes eran los agentes

---

(¹⁶) En el caso de *Cuevas*, supra, luego de afirmarse que el ·propósito de defraudar era "requisito o elemento esencial del delito", a la pág. 305, se dijo:

"No estamos conformes con la interpretación que da el fiscal a los preceptos legales que acabamos de transcribir. El propósito claro y evidente de la sección 4, supra, es proveer un procedimiento para comprobar *a posteriori* o sea por hechos subsiguientes cuál era la intención o propósito que tuviera en su mente el librador de un cheque sin fondos en el momento de expedirlo y entregarlo a otra persona. Siendo la intención o propósito con que se realiza un acto, una función subjetiva y como tal imposible de ser probada objetivamente, el legislador se vio en la necesidad de dictar reglas de evidencia por virtud de las cuales el juzgador puede deducir conclusiones o establecer presunciones en contra del acusado, basándolas en la conducta o manifestaciones de éste tanto en el momento de expedir el cheque como después de haber sido notificado de su rechazamiento. Así, de acuerdo con la sección 2, supra, cuando se hace y entrega un cheque y el girado rehusa pagarlo por insuficiencia de fondos, de esos hechos surge la presunción *juris tantum* de que el librador del cheque sabía en el momento de expedirlo que no sería pagado. Para proteger a aquellas personas que hubieren librado un cheque creyendo de buena fe que tenían fondos suficientes para su pago, la ley (sección 4, supra) concede al librador un plazo no menor de diez días, contados desde la fecha en que le fuera notificada la falta de pago, para hacer efectivo el importe del cheque. Y si el librador dejare expirar el plazo sin recoger el cheque, entonces surgirá en su contra como 'presunción controvertible la de que su propósito al expedir el cheque fue el de defraudar a su acreedor (sección 5, supra)."

o agente de esos tenedores. El único aviso escrito presentado en evidencia tampoco lo decía. La evidencia oral tampoco lo estableció.

La falta del cumplimiento de esta condición precedente y jurisdiccional dejó sin poder judicial alguno al tribunal para castigar al peticionario. Mientras se carezca de la facultad para castigar, todo encarcelamiento o prisión resulta ilegal. Cuando para los fines de una convicción un eslabón esencial de la cadena queda totalmente destruído y no existe posibilidad de tal convicción, procede el hábeas corpus. ([17])

■ 2.—Al no entregarse al peticionario sendas copias de las denuncias se violó su derecho constitucional a "ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma." ([18])   (De los autos no aparece renuncia efectiva de este derecho constitucional.)

■ 3.—Al no darse lectura a las siete denuncias, ni concederse oportunidad al peticionario o a su abogado para hacer la alegación correspondiente, antes de comenzar el juicio, se violó su derecho constitucional a no ser privado de su libertad sin el debido proceso de ley. ([19])

El Tribunal Superior, Sala de Aguadilla, no permitió al peticionario la presentación de evidencia en cuanto al

---

([17]) *Ex parte Salvá*, 41 D.P.R. 27 (1930); *Gandía* v. *El Pueblo*, 29 D.P.R. 109, 115 (1921). Cf. *Steward, In re*, 2 Cal. App. 2d 252, 37 P.2d 699; *Meisner, In re*, 30 Cal. App. 2d 290, 86 P.2d 124; *Ex parte Griffin*, 257 Pac. 458 (1927) Cal.

([18]) Art. II, Sec. 11, Constitución del Estado Libre Asociado de Puerto Rico. La Carta Orgánica del 1917, sólo concedía el derecho "de obtener copia" de la acusación. Nuestra Constitución hace compulsoria su entrega sin que medie solicitud para obtenerla.

([19]) Art. II, Secciones 7 y 11 de la misma Constitución; Arts. 28 y 29, Código de Enjuiciamiento Criminal, 34 L.P.R.A. 58, 59; *Pueblo* v. *Colón*, 70 D.P.R. 792, 797 (1950), en el cual dijimos:

"Bajo los anteriores preceptos es imperativo leerle la acusación al acusado, aunque desde luego ése es un derecho que puede ser renunciado. Y aquí no aparece tal renuncia.

"El derecho por parte de un acusado a hacer la alegación correspondiente, bien de inocencia o de culpabilidad, así como a tener un juicio rápido y público, forman parte del debido procedimiento de ley."

incidente sobre inhibición del juez de distrito. En relación con su alegación de que no se le había celebrado un juicio imparcial y justo procedía que se considerara la estrecha relación familiar de tío y sobrino existente entre el juez que lo juzgó y el abogado del supuesto perjudicado. Dicho letrado había intervenido como tal en representación de Oyola Torres para efectuar el indispensable requerimiento que exige el estatuto. Como ya hemos expuesto, la eficacia de ese requerimiento la tenía que determinar el juez. Éste tuvo que considerar, y en efecto consideró, la cuestión sobre la admisibilidad de la carta del 18 de octubre de 1955 escrita por su sobrino. La admitió a pesar de las objeciones que sobre su admisibilidad formuló el abogado del denunciado. Le reconoció plena eficacia a ese requerimiento para los fines de la convicción, no obstante resultar un requerimiento fatalmente defectuoso. Cf. 50 A.L.R.2d 143-170.

El propio juez de distrito caracterizó sus relaciones familiares con dicho abogado como una "anomalía". Pero resolvió juzgar porque consideró "tardía" la moción de inhibición, no obstante haberle informado el abogado del denunciado que tuvo conocimiento de esas relaciones en el mismo acto del juicio.

El juez superior no debió haber rechazado la evidencia que le ofreció el peticionario con el propósito de demostrarle: (1) que el letrado sobrino del juez sentenciador estuvo presente durante el juicio y sentado junto al fiscal privado; (2) que dicho juez sentenciador acostumbraba inhibirse de actuar en todos los casos en que su sobrino letrado postulaba ante su tribunal como abogado de alguna de las partes y (3) de que existía una acción civil pendiente entre el supuesto perjudicado y el peticionario, sobre el cobro del importe de esos cheques, que era de conocimiento del juez, y en la que su sobrino representaba como abogado a Oyola Torres.

Ante nos asume el fiscal la posición de que "el juez no tenía que inhibirse, por cuanto su relación con el licenciado Reichard está dentro del tercer grado", citando los casos de *Pueblo* v. *Berenguer*, 59 D.P.R. 81 (1941) ; *Laíno* v. *Blondet*, 27 D.P.R. 346 (1919) ; *Ayala* v. *Maryland Casualty Co.*, 47 D.P.R. 345 (1934) y el art. 23 del Código de Enjuiciamiento Civil, que fija los casos en que un juez *deberá* inhibirse de actuar, entre ellos, en todo pleito o procedimiento judicial en que el juez tuviese parentesco de consanguinidad con el abogado de cualquiera de las partes dentro del segundo grado.[20]

Ninguno de esos tres casos sostiene la alegación del fiscal. Técnicamente, su posición es correcta en cuanto la misma está apoyada en lo dispuesto por el art. 23, observándose la situación aisladamente y en términos de estricto derecho. Correspondía a la conciencia del juez decidir si no obstante estar ligado por lazos de parentesco con el abogado de la parte supuestamente perjudicada, su mente estaba libre de

---

[20] En su texto original este artículo no incluía como causa de inhibición el parentesco del juez con el abogado de cualquiera de las partes. Al enmendarse por Ley núm. 19 de 20 de mayo de 1921, se incluyó esa relación entre las causas de inhibición obligatoria, limitándola hasta el segundo grado de consanguinidad o afinidad entre el juez y los abogados de las partes, e incluyendo el caso en que el juez hubiere sido fiscal en una investigación o proceso criminal donde los hechos sean los mismos que en el pleito sometido a su resolución. Posiblemente los casos de *Gandía* v. *Stubbe*, 29 D.P.R. 153 y 160, decididos en marzo del mismo año, provocaron la enmienda hecha por la mencionada Ley núm. 19.

El art. 23 fue copiado del art. 59 del Código de Procedimiento Civil de Idaho de 1881, que a su vez fue copiado del 170 del Código de Procedimiento Civil de California. Idaho ha mantenido el suyo inalterado. California, sin embargo, ha enmendado su art. 170, en los años 1893, 1897, 1901, 1905, 1915, 1921, 1925, 1927, 1929, 1933, 1937, 1939, 1941, 1951 y 1957, hasta incluir, sucesivamente, todo tipo de relaciones en que un juez puede estar ligado por intereses personales, pecuniarios, de clase y de familia, a las partes en la acción, a la materia en litigio o a su resultado, y hasta incluir, también, el previo conocimiento personal de los hechos del caso que un juez pudiera tener. En cuanto a la relación de parentesco entre el juez y los abogados, la prohibición de actuar se extiende hasta el tercer grado de consanguinidad o afinidad, que es la que existe en el caso de autos.

prejuicio y abierta para considerar y pesar las alegaciones y prueba del denunciado con entera imparcialidad. (21)

El juez debe velar por que la balanza en que se pesan los derechos del ciudadano esté exactamente en el fiel, y cooperar, primero que los demás, para mantener a los tribunales fuera de sospechas de parcialidad. El término "debido proceso de ley" no significa un infalible proceso de ley, (22) pero la negativa del debido proceso de ley es la falta de observar aquella imparcialidad fundamental que es la esencia de todo concepto de justicia. (23)

Siendo las siete sentencias dictadas contra el peticionario por el Tribunal de Distrito, Sala de Aguadilla, absolutamente nulas, por no haberse cumplido estrictamente la condición precedente e indispensable para poder castigar que señala la sec. 4 de la ley núm. 26 de 1934, y, además, por habérsele privado de sus derechos constitucionales y estatutarios mencionados, tal nulidad es revisable en un procedimiento de hábeas corpus. *Jiménez* v. *Jones*, supra.

La amplitud de la presente opinión se debe, en parte, a nuestra firme determinación de rechazar, condenar y eliminar de la administración de justicia en Puerto Rico, incidentes, circunstancias, actuaciones y eventos como los ocurridos en esos siete casos, o análogos a los mismos, que constituyan violaciones a, o que menosprecien los derechos ciudadanos consagrados por nuestra Constitución o concedidos por nuestros estatutos. Hemos relacionado, en el curso de la misma, aquellos errores a nuestro juicio fundamentales, que forman base legal suficiente para invalidar las siete sentencias. De los autos surge la comisión manifiesta de varios otros de menor importancia, pero cuyo efecto cumulativo es indeseable. En ellos aparecen envueltos jueces, fiscales, abo-

---

(21) *Rivera* v. *Corte*, 71 D.P.R. 953 (1950); *García* v. *Corte*, 50 D.P.R. 703 (1936); *Peña* v. *García*, 45 D.P.R. 44.

(22) *Schechtman* v. *Foster*, (C. A. 2) 172 F.2d 339, 341, (Learned Hand, C.J.) (1949).

(23) *Lisenba* v. *California*, 314 U.S. 219, 236 (Roberts) (1941).

gados, secretarios de cortes, alcaides de cárceles y detectives. No deben repetirse, porque la fe de un pueblo en la justicia, como valor esencial de la democracia, debe ser escrupulosamente mantenida por todos los que en ella intervienen en una forma u otra, a los más altos niveles de la responsabilidad pública.

*Debe revocarse la sentencia apelada que dictó el Tribunal Superior, Sala de Aguadilla, el 17 de agosto de 1956, decretarse la nulidad de todas las sentencias dictadas el 16 de diciembre de 1955 por el Tribunal de Distrito, Sala de Aguadilla, contra Ramón Valentín Cruz, en los casos 55–2231, 55–2232, 55–2233, 55–2234, 55–2235, 55–2236 y 55–2237, debiendo quedar el peticionario en libertad, procediéndose a la cancelación de cualquier fianza que hubiere prestado pendiente el recurso de hábeas corpus.*

